23.453 Hold on one second, you have a spear of water there, thank you. You're losing your whole audience. You're in the audience. Good morning, your honors. Okay, kids, we aren't going anywhere. All set? Okay, thank you. Good morning, your honors. It's still morning and I'm here today because in this case, the ALJ in this Social Security Appeal was wrong as a matter of law and his denial was not supported by substantial evidence in denying Jessica Simmons' claim. And in determining whether there is substantial evidence, you need to look at and weigh the evidence from both sides to see whether it's substantial. What adds to and what detracts from substantiality involves weighing the evidence. And under the current regulations, we look at whether the opinions of a medical source are consistent with their own exam findings and other objective clinical and medical evidence like exams and x-rays. And then we also look at whether a medical source is supported by the rest of the evidence, and that includes the claimant's testimony, the opinions of other sources, and the longitudinal evidence. And for psychological impairments, you need to look at the clinical notes as well as the relationship between the therapist or psychiatrist and the patient because you often don't have objective tests in determining mental illness and psychological impairments. And the non-examining consultants of the commissioner, you don't have to look at consistency because they didn't examine the same way as the examiners. They based their opinions on the foundational and the longitudinal opinions and findings of the examining sources. And generally, we look at the part three relationship factors, whether it's an examining source, whether it's a treating physician, how long they've been treating the person, and looking at the way to give a So in this case, I'm going to go through some of the evidence here on substantial evidence. Can I ask you this? As I understand it, there are two doctors who identified two marked impairments. Is that correct? Yes. Did they identify the same marked impairments? No. And it's treating therapist, physician's assistant, Van Ness, who had treated Jessica over several years and he noted over that period her ups and downs, her anxiety. He was with her when she had a mental breakdown and had to go into the hospital. And he gave two separate opinions. He gave one, I think, in February of 2019, after he'd been treating her a few times. And he found that... What are the two marked impairments that he found? He found the marked impairment, let me actually look it up here. He found she had marked difficulties applying and maintaining pace, moderate limitations in interacting with others, concentrating and adapting in the workplace. And that was based on his year of examinations. So that's a marked limitation on pace. Yes. And what was the other marked limitation that Dr. Van Ness... He found moderate in the other two areas, but he did find... So he didn't find marked limitation in two? No, he didn't. No. I thought it was in applying information and maintaining pace. I thought that those were two separate... Yes. I see. Yeah. And he found also that she would miss over four days a month from work and she was unable to deal with work stress and that she was stable but maybe exacerbated. And that was given after the period in question, but it was retroactive to when he first started treating her. Dr. Hartman is the commissioner's own consultant and he's been doing this for a long time and clearly he's not biased against the commissioner. And he examined her and decided that she had moderate difficulties sustaining concentration but marked difficulty sustaining an ordinary routine and marked difficulties regulating her emotions. He diagnosed her with bipolar and PTSD. And the ALJ did not adopt those two findings, saying they were not consistent with the record with his own exam. But Dr. Hartman spent time and talked to her and examined her. And for a psychologist to give an opinion, it's based on their interaction with that patient. And the judge accepted some of Dr. Hartman's findings but not others. He cherry findings. And if we look at all the notes over the period in question, we can see that Jessica Simmons had been in a mental institution right before the period that she had been treated. She had had suicide attempts. She herself realized she had a problem with the Laudid and went into suboxone treatment both for pain and that doctor noted her anxiety during the exams. We have periods in October 2018 where Dr. Jacques, the primary care doc, noted her depression. I'm actually very sympathetic, very sympathetic given the circumstances of her various conditions and experience. But what is the error that you would have us assign in this case? What's the error that you would have us assign? So substantial evidence is a pretty steep hill to climb. Well, I think of, yeah, no, and I agree, but I think it's to be substantial is not any evidence. It's not like a summary judgment where any person could believe in a fact. We have to look at it from both sides. So here we have the examining sources finding that she had moderate and marked limitations in three out of the four areas. We have an ALJ who added no limitations on staying on task, no limitations on missing work. And even a moderate limitation and concentration in adapting means there has to be some limit. And he found that there was no limit in that. But we also have her back pain where Dr. Wasif, again, the commissioner's own examiner who's very experienced, he's been doing this for over 20 years, he looked at x-rays, he gave tests, and he opined that she had moderate limits in sitting, standing, walking, pushing, and pulling. And the ALJ did not incorporate those. Again, he did not agree with his own doctor. Instead, he relied on his non-examining doctors who had to rely on what Dr. Wasif and Dr. Hartman said. And in addition, she had seizures that an EEG showed they were epileptic seizures, and that lasted over a year. And the judge didn't add that into the residual functional capacity limitations. For over a year she had seizures, and then she had small seizures where she was not allowed to drive till after the period in question. She had 20 smaller seizures where her vision got blurry, and she passed out. Am I right that there were some medical examinations that showed that her memory, her attention, her motor strength, gait, and reflexes were normal? Yes, yeah, there were at some times, and that's part of her longitudinal history, that she went up and down. And there were periods where she was so unstable and so anxious that she had to be hospitalized. She was being treated with Abilify, which is a very strong anti-psychotic and anti-schizophrenic drug. So I don't think, you're reasonable people, and you've looked at the evidence from both sides. And based on this, I don't think the evidence was substantial that she was able to work during this period in question with this constellation of impairments. And her mental health did get better at a point. And it's possible she was only disabled for that period. Is that because of the drug? Because she was finally, for years she had, it's not because of the Laudu, it's because of they were changing her medications, they were adjusting them. At what point, at what point did the changes in medications achieve, and is there a finding to this effect? At what point did the changes in medications overcome the seizures? The seizures never. I mean, they, at late, I think it was, So there's the normal and then the small. There were smaller ones, but there were still seizures. But it was over a year period. I think it was late, towards We're talking about 19 months here, is that correct? Yeah, yeah. I think that they finally found increased Keppra, where she only had small seizures, but still those small seizures would limit her ability to work on a full-time basis. Was there a period within the 19-month claim when she was having massive seizures, large seizures? Yeah, for most of the period. Before the drugs alleviated that. I think it was, well, in June 16th, 2019, that's when she, the seizure was witnessed in the hospital and the EEG showed a seizure. And I think by September 13th, towards the end of the period, she was treated at the clinic, and that's when I think the seizures started getting under control. But I think the whole period in question, she was unable to work, did not have the RFC, and the evidence certainly does not show until July 24th, when her mental health, psychotropic meds kicked in, that she was stable enough mentally. So, thank you. Thank you. And you reserve some time for rebuttals. Yes. We'll hear from your friend on the other side. Good morning. Good morning. May it please the court, Shannon Fischel on behalf of the Acting Commissioner of Social Security. Substantial evidence is a high hill to climb, and this record does not climb it for Ms. Simmons. Briefly, to turn to the question of seizures, Ms. Simmons did have a seizure in February 2018, and then... February 21? 2018. She had a seizure. She went to the emergency room. Findings were ultimately normal, including MRI findings. She treated with a neurologist, Mr. Madzer, and he actually recommended she was placed on Keppra when she visited the hospital in February 2018. She met with Mr. Madzer a month later. He actually recommended she taper off Keppra because he was concerned that she was using the IV Dilaudid. She then began her substance abuse treatment for the IV Dilaudid, and apparently she had a minor seizure event in October 2018, but she did not go to the hospital or the doctor for that. She called Mr. Madzer, and he restarted her Keppra. She did have another seizure event in December 2018, where she went to the emergency room for treatment. Again, imaging... My question, based on what it is you're saying and your adversary, is there a period within the 19-month period of issue when she was suffering seizures with a frequency and a severity such that she could not work? No, Your Honor. Her seizures were brought under control with the Keppra, and it required some titration of dosage. But at some point, and the question is, until that point, it was not under control, right? They were happening sporadically, but they were not disabling her for a continuous 12-month period of time, as she would be required to show under the statute. They are under control by December 2018. In March 2019, she reports she hasn't had any seizures. Now, Mr. Schneider refers to an event in June 2019 where she has a tonic-clonic seizure, but that is in a clinical setting where they have removed her from all medication and then deprived her of sleep in an effort to actually bring on a seizure so that they can test her. Once that seizure is brought on, they again put her on Keppra, and by the time she is at the hearing for the ALJ, she testifies that she's allowed to drive because she gets this two-minute warning, an aura, she describes it as, and then all she has is some minor blurry vision, a little bit of disorientation. So her seizures are well controlled. She does not demonstrate any continuous period of seizure activity that would be disabling under. Let me ask you this. You have two doctors, both of whom identify marked limitations, but they identify different marked limitations. Yes, that is correct. Should we look at this in terms of deciding whether there's sufficient evidence as, well, there's no doctor, there's no two doctors who say she has any marked limitation, or should we look at this and say, well, there are two doctors that between them identify four marked limitations, and if she has that, I don't see how she can work. Well, Your Honor, I do not believe that it makes a difference whether you describe it as four marked limitations or two doctors describing marked limitations, because ultimately the ALJ evaluated those doctors' opinions and found that they were not persuasive. The ALJ did not credit the marked limitations quite fairly, given the evidence of record, which shows the marked improvement in her symptoms, in her mental impairments during her course of treatment, particularly with Mr. Van Ness. And the other opinions of record related to her mental impairments show that the doctors and the administrative agency reviewers found she had mild to moderate limitations. So there are opinions of record that the ALJ finds persuasive. The ALJ also finds that she has severe mental impairments. The ALJ does not determine she is not disabled because she can return to her skilled work as a nurse or an assistant manager, but the ALJ instead accommodates her and accounts for her mental limitations through the RFC finding, which, as you'll recall, limits her to simple duties that require little to no judgment that can be learned in a short amount of time on the job. And the ALJ also limits her to making simple work-related decisions and few workplace changes. And so understandably, the ALJ did not credit the marked limitation because, as you see in the records, Ms. Simmons herself is showing up to her treatment source, Mr. Van Ness, and saying that she is not having depressive symptoms, she is not having anxiety symptoms, and he's noting she's not showing signs of mania, she's not showing elevated mood. And this all occurs within basically less than 12 months' time from her alleged onset date. And so the substantial evidence supports the ALJ's finding that the marked limitations were not persuasive, and it also supports the ALJ's finding for the RFC restrictions. Thank you very much. If there are no further questions, I will simply rest on the We don't argue that my client, Jessica Simmons, met the listings for epilepsy, which is when you it is so severe you can't do anything, and she didn't. But you would have to include those limits in her residual functional capacity to work on a consistent basis, to be on task, to show up at work. And so what the government, as I recalled, and as was just said, what it points us to is the fact that there was a accommodation, if that's the right word, by the ALJ in connection with the RFC, where it's light work as opposed to returning to her prior position. Well, yes. And very limited work. But it didn't include being off task when you're at work and you can't do the work, you can't concentrate, you can't focus, you're unable to be at your workstation. And it doesn't include missing time off from work. The vocational expert for the commissioner said if you have 10 days off a year without excuse, then you can't hold down a job. Is a medical excuse an excuse? You said 10 days without excuse. Not without unexcused absence, meaning unanticipated, being calling in sick would be it. And the hearing in this case was quite a bit after the date last insured. But even at that point, she was still having these smaller seizure events that, you know, if you're working in a checkout line at a store or working in a factory, you can't just stop working and not do the job because you're dizzy, because you can't focus and concentrate. And even if she didn't have market limitations in these areas and didn't meet the mental health listings, you still have to include even moderate limitations as found by the ALJ means something. It means you have a limitation in concentration, in focus, in the ability to get along with people. And if you include that, it's more than just having simple work. Let's see. Yeah, even if there's no per se listing, there is not substantial evidence that she was able, no person, reasonable person, you, three reasonable judges, could find that she could work on a full-time sustained basis based on the medical evidence, particularly the opinions of the commissioner's own examining experts. Thank you. Thank you very much. You're welcome. We'll reserve the decision in this matter as well.